UNITED STATES of America,

v.

**Juan RAMIREZ, Defendant.**

**No. S1498 CR. 438RLC.**

United States District Court,
S.D. New York.

Sept. 21, 2000.

402

Mary Jo White, United States Attorney for the Southern District of New York, New York City (John M. Hillebrecht, Joshua G. Berman, Assistant United States Attorneys, of Counsel), for U.S.

Joel S. Cohen, P.C., New York City (Joel S. Cohen, of Counsel), for defendant.

### OPINION

**ROBERT L. CARTER, District Judge.**

Defendant Juan Ramirez moves to suppress evidence collected during a search of his Bronx residence pursuant to F.R.Crim. P. 12(b)(3), 41(f) and U.S. Const. Amend. IV.[1] Defendant alleges that Elsie Serrano, the person who is said to have consented to the search, was not authorized to give consent to search his residence, and further was fraudulently induced to consent.[2]

## I. BACKGROUND

### A. Pre–Hearing Matters

Initially, defendant filed a motion dated January 13, 2000, to suppress the evidence collected during the search of his residence. (Doc. # 103) ("Schwarz affirmation"). In an endorsement dated February 1, 2000, the court dismissed defendant's motion because the only proof submitted in support of the motion was defendant's prior lawyer, Roger Schwarz's, affirmation, and Schwarz was not present at the time of the search. *See United States v. Ramirez,* 98 Cr. 0438 (S.D.N.Y.2000) (Carter, J.).

On February 14, 2000, defendant renewed the motion to suppress and submitted an affidavit from Elsie Serrano, who was present during the search, in which she adopted most of the factual assertions in the Schwarz affirmation as her own. (Gov.Ex. 2A) ("Serrano affidavit"). Based on these submissions the court set the matter for a hearing, which commenced on July 13, 2000, continued on July 18 and 19, and concluded on July 31, 2000.[3]

### B. Hearing Facts

The government's three witnesses, New York Police Department ("NYPD") Lieutenant Steve Boldis, Bureau of Alcohol Tobacco and Firearms ("ATF") Group Supervisor Laurie Horne, and ATF Agent James Bauer (the "officers") testified to the following facts:[4]

Ramirez was arrested on May 14, 1998, at 2:00 P. M., outside his 946 Anderson Avenue apartment (the "apartment") in the Bronx. (Tr. I, 6–8).[5] He was searched at the time of arrest, and Horne indicated that he was wearing a bulletproof vest and carrying a loaded gun. (Tr. I, 7). Horne took the defendant to the

---

1. Defendant also moved to suppress the evidence obtained during the consent search pursuant to U.S. Const. Amends. V and VI. The court finds these motions to be of no merit.

2. Defendant has been charged in a 23 count indictment, for, *inter alia,* racketeering, kidnaping, murder, assault, and narcotics conspiracy.

3. On the first day of the hearing, the government advised defendant's present attorney, Joel S. Cohen, that if Serrano's testimony at the hearing was consistent with her attestations in the Serrano affidavit, there was a "substantial likelihood" that she would be indicted for perjury. (Tr. I, 2). The government and defendant's counsel requested that the court appoint Serrano independent counsel to ensure that she understood the repercussions of her testimony and her options. (Tr. I, 3). The court granted the parties' request, and Peter Quijano immediately took on Serrano's representation.

The two Assistant United States Attorneys ("AUSA") in this case should be commended, as they were not required to be as vigilant

about this material witness's interests as they were. They acted admirably when they informed Serrano that she would face serious penal risks if she lied on the witness stand, and sought to have the court appoint counsel on her behalf. The AUSA's actions prevented Serrano from inadvertently committing a crime out of a misguided sense of loyalty to her former boyfriend and his family, loyalties that, given her youth and inexperience, could have proven overwhelming.

4. Boldis is a retired NYPD lieutenant and was chief investigating officer for the police department in the Ramirez investigation; Horne is an ATF case agent who had supervisory responsibility for the Ramirez investigatory team; Bauer is an ATF officer who participated in the Ramirez arrest.

5. Tr. I. refers to the transcript of the proceedings conducted on July 13, 2000. Tr. II refers to the transcript of the proceedings conducted on July 18, 2000. Tr. III refers to the transcript of the proceedings conducted on July 19, 2000. Tr. IV refers to the transcript of the proceedings conducted on July 31, 2000.

44th and 50th precincts for processing. (Tr. I, 7–8). Boldis indicated that he saw defendant's relatives, as well as Serrano, gather outside the apartment at the time of the arrest. (Tr. II, 86). Boldis explained that he knew who Serrano was because she had been identified through informants and various forms of surveillance as defendant's live-in girlfriend; surveillance also revealed that defendant kept guns and police paraphernalia in the apartment. (Tr. II, 88–89, 113).[6] After returning to the 44th precinct, Boldis discussed the possibility of searching the apartment for contraband, either through a consent search or search warrant, with prosecutors. (Tr. II, 90, 118). Boldis testified that both avenues were plausible, but that he chose to pursue a consent search because it was more time-effective. (Tr. II, 121). Boldis then assigned two detectives from the juvenile crime squad to guard the apartment to prevent the removal of evidence. (Tr. II, 90–91).

Boldis returned to the apartment around 4:00 P.M. the same day with Captain Ferrari, his commanding officer, and two other officers, at which time the common area outside the apartment was filled with defendant's relatives, as well as Serrano and Maria Camacho, the mother of defendant's child. (Tr. II, 91–93). The officers introduced themselves to the family and indicated that they wanted to perform a search of the apartment. (Tr. II, 94). Jacinto Ramirez, defendant's father, stated that he was superintendent of the building, that the basement apartment in the building was provided to him as payment for his work, and that Serrano and defendant were the sole occupants of the apartment. (Tr. II, 95). He also indicated that the officers could search the apartment, that "there is nothing in there." (Tr. II, 94).

Boldis replied that only Serrano could consent to a search (*Id.*).

Serrano invited the officers into the apartment. (Tr. II, 96). Jacinto Ramirez attempted to enter the apartment with the officers, but Boldis asked him to stay outside. (Tr. II, 123). Inside the apartment Boldis informed Serrano that the police wanted to search the apartment for police paraphernalia and other evidence; Serrano agreed to the search. (Tr. II, 96). At this time, Boldis testified that he performed a brief (15–20 second) visual sweep of the apartment, during which he saw several indications that Serrano lived in the apartment: hairbrushes, women's clothing on top of the bed and dresser, and a picture above the bed reading "Elsie and Tony Forever." (Tr. II, 98–99).[7] Boldis testified that during this conversation Serrano stated that she was nineteen years old and had a "common law type" relationship with the defendant. (Tr. II, 97, 125).[8] Boldis testified that he questioned Serrano for five or six minutes in a "conversational" and "personable" manner, and at no time did he tell Serrano that he would get a search warrant for the apartment. (Tr. II, 96–98). Boldis did not explain to Serrano that the apartment could not be searched without either her consent or a search warrant. (Tr. II, 126). Boldis testified that he did not perform a consent search at that time because the lead officers in the case, including Horne, were absent. (Tr. II, 99).

Boldis then returned to the 50th precinct where he contacted Horne to tell her that Serrano was willing to consent to a search, and that he would meet her at the apartment later in the day. (Tr. II, 99–100). Horne took a "consent to search" form ("consent form") and went to the

---

6. Boldis indicated that as of May 14, 1998, the investigation of the defendant had proceeded for approximately fifteen months, in the course of which surveillance and informant interviews were conducted. Video surveillance revealed Serrano and defendant in the vicinity of the apartment. (Tr. II, 111–12).

7. "Tony TKO" is the defendant's nickname. (Tr. II, 15).

8. In fact, Serrano had turned eighteen just a few days before the search, and was in high school at the time. (Tr. II, 30).

apartment with Bauer, arriving at approximately 6:00 P.M., at which time they met Boldis and another officer. (Tr. I, 8–9). Horne testified that upon entering the common area she walked up to Serrano, introduced herself, discussed Ramirez's arrest, and asked whether Serrano lived in the apartment. (Tr. I, 10). Horne and Bauer recalled that Serrano was agitated: she stated that she was Ramirez's girlfriend, she lived with him in the apartment, she knew he had been arrested, and she was extremely afraid for her safety, i.e., worried that Ramirez might cause her to suffer retaliation for having spoken with the police. (Tr. I, 11, 73). Bauer further testified that he heard Serrano express fear for her children's lives. (Tr. I, 93).[9] Horne requested permission to search the apartment and Serrano agreed, opening the door and inviting the officers inside. (Tr. I, 12). Bauer testified that the officers explained to Serrano the difference between a consent search and a search warrant both during this conversation and once in the apartment. (Tr. I, 72). Bauer and Horne testified that the officers wore their weapons holstered during this exchange, (Tr. I, 13, 85), and that at no time did they order Serrano to let them in. (Tr. I, 12–13).

Sitting at the kitchen table, Horne again requested Serrano's consent to search the apartment, and read the contents of the consent form to her. (Tr. I, 14, 18, 55). Horne did not explain the contents of the consent form, but she did ask Serrano whether she had any questions regarding the form, and Serrano had none. (Tr. II, 19, 55–57, 104). Horne further testified that Serrano appeared to read the consent form, and in response to Horne's inquiries, indicated that she had grown up in the United States and understood English. (Tr. I, 18–19, 75). In the course of the conversation Serrano repeated that she lived in the apartment with the defendant,

that she feared that the defendant might harm her, and that she was planning to move out of the apartment that night. (Tr. I, 15–16, 76). Notwithstanding these concerns, she signed the consent form. (Tr. I, 19).[10]

Horne and Boldis testified that none of the officers present told Serrano that they had a search warrant or were attempting to secure one, nor did Serrano ask any questions about a search warrant. (Tr. I, 16, II, 104). Horne testified that Serrano at no time requested permission to talk to anyone else. (Tr. I, 23).

Bauer and Horne both testified that during the search Serrano lead the officers around the apartment, explaining where Ramirez stored his belongings. (Tr. I, 23, 94). Horne testified that Serrano exhibited familiarity with the contents and layout of the apartment, and both Horne and Bauer noted that Serrano's clothing and pictures were found in the bedroom and throughout the apartment. (Tr. I, 23, 79–80). Upon searching the bedroom closet the officers found an NYPD raid hat, handcuffs, a raid jacket, a badge, a badge case, and a bulletproof vest. (Tr. I, 21–22). When the search was completed Horne gave Serrano her card and telephone number, told her to call if she had any problems, and advised her to move in with an adult. (Tr. I, 24).

The next day at around 6:00 P.M., Serrano called Horne and indicated that she was with defendant's father, Jacinto Ramirez, and that they wanted a copy of the search warrant for the apartment. (Tr. I, 25–26). Horne informed Serrano that there was no search warrant, and reminded her about the consent form. (Tr. I, 26). Serrano acknowledged that she remembered signing the consent form and the conversation ended. (*Id.*).

Defendants' witnesses confirmed much of the officers' testimony, aside from sev-

---

**9.** Serrano, in fact, has no children. Defendant cites this error as evidence of Bauer's lack of credibility. Given the passage of time and the non-criticalness of the issue, the court finds this conflict of no moment.

**10.** The consent form indicates the Serrano signed it at 6:10 P.M.. (Gov.Ex. 3).

eral important divergences. Angel Delgado, defendant's nephew, indicated that when the first group of officers (Boldis, etc.) arrived, he and Maria Camacho, mother of defendant's child, pointed the officers to defendant's father, Jacinto Ramirez, as the person who lived in the apartment, but the officers instead focused their questioning on Serrano. (Tr. I, 160–61). In conflict with the officer's account, Camacho and Virginia Ramirez, defendant's mother, indicated that these officers spent twenty minutes talking to Serrano, and that when they overheard the officers' voices coming through the closed door they sounded "aggressive" and "loud." (Tr. I, 111, 149). Delgado testified that he heard the officers through the closed door of the apartment stating that they would be back with a search warrant. (Tr. I, 161–162).

Camacho stated that after her conversation with the officers, Serrano seemed under the impression that the officers had a search warrant. (Tr. I, 111). When she asked Serrano whether she had seen the warrant, Serrano answered "no." (Tr. I, 112). She then advised Serrano to ask the officers to show her the warrant. Serrano went back into the apartment and the officers present told her that the warrant was "on its way." (Id.).[11] Virginia Ramirez also said that the officers told the family that they were going to get a search warrant. (Tr. I, 149).

Serrano testified that she went to the apartment upon learning of defendant's arrest. (Tr. II, 7–8). There she was approached by two officers who said that they would be back in several hours with a search warrant. (Tr. II, 10, 62). Serrano indicated that when different officers returned several hours later, producing a piece of paper for her to sign, Serrano asked if she could leave the apartment to speak with Ramirez's parents. (Tr. II, 12, 63). She was told that she was only signing the consent form as a witness to the

search, and therefore did not need to consult them. (Tr. II, 12). Serrano admitted that there was no mention of a search warrant at any time during the search or when she was handed the consent form to sign by Horne. (Tr. II, 75). She explained that she thought the document was a search warrant since that was what she was told they would bring the first time they came. (Tr. II, 12, 70). Serrano could not remember if she asked the officers whether the document they presented her with was a search warrant. (Tr. II, 25). She also did not recall whether Horne read the consent form to her. (Tr. II, 68).

Serrano testified that she skimmed the consent form, signed it, and put down the 946 Anderson Avenue address as her own, even though she was living in Manhattan with her family at the time. (Tr. II, 13, 15, 46–47, 69). She testified that she informed the officers of this fact, but that they told her to write down the 946 Anderson Avenue as her own since she had spent the prior night there. (Tr. II, 15, 64). She indicated that she sometimes stayed at the apartment on weekends, and generally, the only clothes that she kept in the apartment were those she brought with her then. (Tr. II, 47–49). However, during the entire week prior to the arrest she had stayed in the apartment to care for the defendant, who had recently been shot. (Tr. II, 48, 73). She confirmed that there was a picture in the bedroom stating "Elsie and Tony forever." (Tr. II, 51).

Serrano agreed that the conversation with the officers was calm, without threats or raised voices, (Tr. II, 65–66), but asserted that she was nervous and confused when she signed the consent form, and did not know what was going on. (Tr. II, 15, 65). She denied telling any of the officers that she feared the defendant or that she feared reprisal if it was revealed that she had talked to the officers. (Tr. II, 17).

■ Serrano stated that before she signed the consent form one officer was already searching in a closet behind the

---

**11.** It is unclear whether Camacho was referring to Boldis and the three officers with him, or the detectives from the juvenile crime squad who were standing guard.

door,[12] and that the officers proceeded into the bedroom as soon as she had finished signing the consent form. (Tr. II, 72). Serrano indicated that she did not assist in the search, but she did follow them as they proceeded through the apartment. (Tr. II, 72–74).[13]

## II. DISCUSSION

■ The government bears the burden of proof when a defendant challenges a consent to a search. *See Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The government must show by a preponderance of the evidence that (1) the party who gave permission to conduct the search had the requisite authority to consent to the full scope of the search conducted, *see United States v. Matlock*, 415 U.S. 164, 171, 177, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), and (2) given the totality of the surrounding circumstances, that the consent was voluntary. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

■ The court first considers defendant's contention that Serrano did not have authority to consent to a search of the apartment. A third party can give authority to search an area only when that person has "common authority" over the specific area to be searched. *Matlock*, 415 U.S. at 171, 94 S.Ct. 988. "Common authority" means "joint access or control for most purposes." *Id.* at 171, n. 7, 94 S.Ct. 988. Interpreting *Matlock*, the Second Circuit has explained that a third party's consent to search is valid when the search meets two criteria: "first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." *United States v. Davis*, 967 F.2d 84, 87 (2d Cir.1992) (citing *United States v. Gradowski* 502 F.2d 563, 564 (2d Cir.1974)). Under this rationale the Second Circuit has repeatedly upheld searches of adult defendants' bedrooms and other private spaces where another occupant of the home con-

**12.** The court notes that even if it were to accept this statement as true, the officers' search of the closet behind the door did not result in the discovery of evidence, nor did it subject Serrano to additional pressure to sign the consent form. The evidence that forms the subject of this motion to suppress was the product of a search of the bedroom, which occurred only after the officers secured Serrano's independent written consent. It is therefore not tainted by any earlier official action.

**13.** In its brief, the government indicated that Serrano's testimony should be given no weight because it is perjurious. To support this claim, the government introduced a letter written by Serrano to the defendant after he was arrested, dealing with the circumstances of the search. (Tr. IV, 13). This letter allegedly formed the basis for the affirmation submitted by defendant's prior lawyer, Roger Schwartz. (Tr. IV, 28–29). The substance of the letter was not materially different from the substance of Serrano's testimony. However, the letter contained a note on the second page stating, "Honey, like this, help me out, tell me what you want different." (Tr. IV, 18). Serrano testified that although at the time of writing the document she was asking the defendant how best to change the story according to his preferences, after speaking with her own attorney she realized she "couldn't lie." (Tr. IV, 22).

In the court's view, this letter suggests that Serrano felt pressure, self-imposed or otherwise, to help her boyfriend. It does not, standing alone, establish that she changed her testimony in light of defendant's prodding. Since Serrano never made a statement at the scene about her perceptions regarding how her consent was obtained, her statements at trial and in the Serrano affidavit do not materially conflict with any prior representations. Furthermore, no evidence was submitted showing that the letter and the subsequent Schwarz affirmation were produced in connection with each other.

After conferring with her attorney, Serrano also offered testimony to clarify her understanding of the affidavit that she signed. She explained that she did not know what an affidavit was at the time she signed the affidavit, and that she did not understand several words in the affidavit. (Tr. II, 19–20, 22–23). Indeed, Serrano testified that it was only after she consulted with her appointed counsel that she understood that an affidavit was a sworn statement, and that her affidavit had indicated that she adopted the Schwarz's affirmation as her own statement. (Tr. II, 19–20).

sented, and even where the third party no longer lived in the searched premises. *See, e.g., United States v. Jenkins,* 496 F.2d 57, 72 (2d Cir.1974) (finding that defendant's sister, who occupied one room, could validly consent to search of defendant's room); *United States v. Trzaska,* 859 F.2d 1118, 1120 (2nd Cir.1988) (finding that estranged wife could properly consent to search of defendant's apartment).

■ At the hearing, Serrano testified that she did not live at the apartment and that she informed the officers of this fact. She further testified that she did not remember how the officers ended up inside the apartment on either of the two meetings. Serrano's testimony is contradicted by the testimony of officers Horne, Bauer and Boldis, who attested that Serrano stated that she lived at the residence, that she and the defendant had a "common law type" of relationship, and that she invited the officers inside the apartment on both meetings of May 14, 1998. (Tr. II, 97). Furthermore, Boldis testified that defendant's father informed him that Serrano shared the apartment with defendant, and that the officers could enter the apartment because the couple had nothing to hide.

■ Even if Serrano did not in fact have authority to consent to the search, the officers' conclusion that she had authority was reasonable under the doctrine of apparent authority. *See Illinois v. Rodriguez,* 497 U.S. 177, 185–86, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (holding that a warrantless search based upon the consent of a third party is valid if the police, at the time of entry, reasonably believe the

third party to possess common authority over the premises, even if the third party does not in fact have such authority). According to the officers' testimony, Serrano opened the door to the apartment and invited the officers inside, showing that she had both access to the area and permission to enter.[14] Upon entering the apartment the officers saw her clothes and pictures, demonstrating that she had a substantial interest in the premises. At the hearing Serrano confirmed that she had property at the apartment at the time of the search, that she had stayed there at least the entire week prior to the arrest, and that there was a picture over defendant's bed reading "Elsie and Tony Forever." This evidence, combined with input from fifteen months of surveillance showing her presence at the premises, made it objectively reasonable for the officers to conclude that Serrano had sufficient authority over the premises to consent to a search.[15]

■ Even if the court proceeded to the more narrow question of whether Serrano had sufficient authority to allow the officers to conduct a search of defendant's personal possessions, (the closet and dresser drawers where the contraband was found), defendant's claim still fails. In *United States v. Perez,* 948 F.Supp. 1191, 1200–01 (S.D.N.Y.1996) (Sweet, J.), the court found that a father's entry into his son's unlocked bedroom and removal of a suitcase from the unlocked closet was sufficient to indicate to the authorities that he had permission to gain access to the son's room and the closed containers therein.

14. While Serrano testified that she did not own a key to the apartment, (Tr. II, 48–49), a fact not contested by the government, she appeared to have authority to enter and exit at will. Moreover, while the Second Circuit has found a key to the premises to be a factor in the analysis of common authority, *see, e.g., Trzaska,* 859 F.2d at 1120, it is only one factor in a "multi-factored factual question that turns on the access, use and reasonable expectations of the parties involved." *United States v. Perez,* 948 F.Supp. 1191, 1200 (S.D.N.Y.1996)(Sweet, J.) (citing *Matlock,* 415 U.S. at 171, n. 7, 94 S.Ct. 988).

15. At the hearing, counsel for both sides expended much effort to establish whether or not Serrano "in fact" lived in the 946 Anderson Avenue apartment, offering testimony from various witnesses and documentary evidence such as her high school records. However, these offers of proof were at best peripheral. The dispositive issue is whether or not it was reasonable for the officers to conclude that Serrano had sufficient common authority over the premises to consent to the search. *See Rodriguez,* 497 U.S. at 185–86, 188, 110 S.Ct. 2793.

According to the officers' testimony in this case, Serrano accompanied the officers around the apartment and directed the search: pointing out areas where Ramirez's possessions were, and where her own were stored.[16] No testimony was provided indicating that any of the closets or dressers were locked or otherwise secured. Crediting the officers' testimony, the court finds that Serrano's actions were sufficient to establish her authority to allow the officers to search the closets and dressers.

■ Defendant next contends that Serrano's consent to the search should be invalidated because her consent was not voluntary. In ascertaining whether a consent to search is voluntary the court looks to the "'totality of all the circumstances'" to determine whether the consent was "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *See United States v. Wilson*, 11 F.3d 346, 351 (2d. Cir.1993) (quoting *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041). There are arguably two moments when consent was given in this case: during Boldis's meeting with Serrano and during Horne's meeting with Serrano. The court considers each scenario in turn.

■ Boldis testified that his 4:00 P.M. meeting with Serrano lasted only five or six minutes, and was conversational in tone. During this meeting, Serrano indicated to Boldis that she would agree to a search of the premises. Serrano agreed that the meeting with Boldis was conversational, but asserted that rather than asking for permission to search, the officers stated that they would be back in several hours with a search warrant.

■ The court credits Boldis's account of the 4:00 P.M. meeting. Delgado and Camacho's claims that they could tell that Boldis and his assisting officer were aggressive and loud when they questioned Serrano is based on what they believe they heard through a closed door. It does not comport with Serrano and Boldis's account that the meeting was conversational. For similar reasons the court accepts Boldis's claim that he never told Serrano that he was leaving to get a search warrant. Delgado claimed to hear this statement through a closed door and conceded that he was primed to listen and remember this statement "as a typical Puerto Rican," constantly subject to police incursions on his rights. (Tr. I, 168). Serrano, who testified that Boldis told her this while inside the apartment also does not seem credible as she does not remember substantial parts of their interaction. (Tr. II, 60). Given the totality of the circumstances, it was reasonable for Boldis to conclude that Serrano had voluntarily consented to a search.[17]

■ The second time Serrano arguably provided consent to search the apartment occurred at approximately 6:00 P.M.[18] Ac-

---

**16.** Serrano contradicted this testimony and stated that she followed the officers, but did not help in the search. (Tr. II, 72–74). The court finds the testimony of the officers more credible.

**17.** Defendant argues that the delay between Serrano's consent to Boldis and to Horne raises the suspicion that the officers knew there was no probable cause for a search warrant and used the threat of a warrant to coerce Serrano's consent. The court disagrees, crediting Boldis's testimony that a search warrant was a plausible alternative that he did not pursue because of time, and that he did not begin the search when he first got verbal consent from Serrano because the lead case investigators, including Horne, were not present. Even assuming that Boldis in

fact told Serrano he would return with a search warrant, "[i]n this Circuit, a statement by a law enforcement agent that he intends to get a warrant does not vitiate the validity of subsequently obtained consent to search, unless the advice given was knowingly false." *United States v. Santiago*, No. 87 CR 800, 1988 WL 52797, at *2 (S.D.N.Y. May 16, 1988) (Kram, J.) (citing *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir.1983)).

**18.** The second time Serrano arguably gave consent is the more significant of the two episodes since it occurred immediately prior to the actual search. Even if Serrano had not given effective consent during her meeting with Boldis, later effective consent immediately prior to the search would be sufficient to

cording to the officers, Serrano first verbally consented outside the apartment, and then signed a consent form inside the apartment. The consent form clearly stated that she had a right to demand a search warrant, that she could refuse to consent, and that she could revoke her consent at any time. (Gov.Ex. #3). Both Serrano and the officers testified that the meeting was conversational and nonthreatening and that the officers never demanded or forced Serrano to let them search.

Serrano agreed that she signed the consent form, but testified that she thought she was signing as a witness to a search. Serrano conceded that no one told her the consent form was a search warrant, nor did she mention her confusion to the officers. Serrano testified that she asked permission to seek counsel from defendant's parents, but Horne denied this fact.

■■■■ Based on the above facts the court finds that it was reasonable for the officers to consider Serrano's verbal and written consent voluntary. The police acted with neither intimidation nor force, and the court credits Horne's testimony that Serrano was not refused the counsel of defendant's parents before signing the consent form. Although Serrano may arguably have thought she was signing a witness form, she did not effectively communicate this information to the officers. Ultimately, the law only requires that an officer's conclusion be objectively reasonable, not that it be correct. *See Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" (citing *Rodriguez*, 497 U.S. at 183–189, 110 S.Ct. 2793)). While the defense correctly points out that the officers failed to articulate to Serrano her right to refuse consent, this right was clearly presented to her on the consent form that she read and signed. *See Unit-*

render the search valid. *Cf. Santiago*, 1988

*ed States v. Tucker*, 57 F.Supp.2d 503, 513 (W.D.Tenn.1999) (finding fact that third-party signed consent form to be an objective indication that her consent was voluntary). Moreover, *Schneckloth* squarely holds that knowledge of a right to refuse consent is only one factor to consider in determining the voluntariness of consent, and the "prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *See Schneckloth*, 412 U.S. at 249, 93 S.Ct. 2041.

■■■■ While the officers may have acted reasonably, they did not act with good judgment. Nothing in the record indicates that the officers would have had any problem securing a search warrant for the apartment during the four hours between defendant's arrest and the time that the consent form was signed. It has long been established that when law enforcement agents wish to search a private residence, the preferred method under the Fourth Amendment is through a search warrant. *See McDonald v. United States*, 335 U.S. 451, 455–56, 69 S.Ct. 191, 93 L.Ed. 153, (1948). Indeed, Boldis's actions are particularly egregious since he put the consent operation in motion. Boldis testified that he believed Serrano to be nineteen when he met her. In fact, she had only recently turned eighteen. In any event, Boldis was presented with a frightened teenager living with a violent boyfriend. His fellow officers' testimony indicates that Serrano repeatedly stated that she feared for her safety. Logic dictated that he presume that Serrano's boyfriend would not look kindly upon her cooperation with the police. Yet, Serrano was encouraged to sign the consent form and was then left to her own defenses amongst the defendant's family. While this surprising lack of good judgement does not invalidate the court's conclusion that the search was valid, it does invite censure.

WL 52797 at *2.

## III.  CONCLUSION

Given these findings, defendant's motion to suppress the evidence from the consent search is denied.   In this case, the facts indicate that Serrano acted with authority, or at a minimum with apparent authority, to consent to the search, and the government has met its burden to show that the consent the officers secured from Serrano was voluntary.

**IT IS SO ORDERED.**