**UNITED STATES of America**

**v.**

**Jimmy Doug SHELTON, et al.**

**No. CRIM.A.1:00CR127–P–D.**

United States District Court,
N.D. Mississippi,
Eastern Division.

Dec. 19, 2001.

Charles W. Spillers, U.S. Attorney's Office, Oxford, MS, Theodore M. Doolittle, U.S. Department of Justice Tax Division, Washington, DC, for U.S.

Jason Lee Shelton, Jimmy D. Shelton & Associates, Tupelo, MS, Charles W. Wright, Jr., Palmer, Wright & Williamson, Meridian, MS, S. Dennis Joiner, S. Dennis Joiner, Attorney, Brandon, MS, Jimmy Doug Shelton, Tupelo, MS, Smith Jones & Fawer, LLP, Covington, LA, Jim D. Waide, III, Waide & Associates, PA, Tupelo, MS, Kenneth H. Coghlan, Kenneth H. Coghlan, Oxford, MS, Willie Sue Carnathan, Tupelo, MS, Paul S. Funderburk, Paul S. Funderburk, P.A., Tupelo, MS, Joseph M. Hollomon, Palmer, Wright & Williamson, Jackson, MS, Jonathan Shelton, Tupelo, MS, Johnnie E. Walls, Jr., Walls Law Firm, Greenville, MS, John Rudolph Coleman, John R. Coleman, Attorney, Tupelo, MS, Lindon F. Baker, Saltillo, MS, for Defendants.

## MEMORANDUM OPINION

PEPPER, District Judge.

This cause is before the Court for consideration of the Magistrate judge's Report and Recommendation that the defendant Jimmy Doug Shelton's Motion to Suppress evidence seized by Cheryl Shelton be granted.

The government filed timely objections to the Report and Recommendation. After due consideration of the objections and a de novo review of the record, as well as the parties' initial submissions and the applicable case law, the Court finds as follows, to-wit:

### FACTUAL BACKGROUND

This case arises out of an alleged charity bingo skimming operation which, according to the government, was run by the defendant, Jimmy Doug Shelton. Mr. Shelton was indicted on forty-plus counts alleging, *inter alia*, illegal gambling, money laundering and tax fraud in connection with the operation. For purposes of this motion, the relevant facts are, generally, undisputed.

In April, 1997, Cheryl Shelton left her husband, Jimmy Doug Shelton, and the house in which they lived. Upon her departure, she left several personal belongings including clothing, photographs, personal and financial documents, memorabilia, and various items of furniture. Although she was not a co-owner of the

house, she retained a key and a security access code for the alarm system.

On May 3, 1997, Cheryl returned to the home with her sister, Debbie Wheeler, and retrieved some of her personal belongings. During this visit, her sister, who had become a cooperating witness since the previous month in the investigation of Mr. Shelton, videotaped boxes of bingo cards. At the suggestion of her sister, Cheryl, who was an alleged co-conspirator in the skimming operation, decided that she would also cooperate with the government.

On approximately May 5, 1997, Cheryl met with Special Agent Harry Bostick of the IRS and AUSA Charles Spillers and began to cooperate in the criminal investigation of her husband. During this meeting, Cheryl informed the agents of various items of evidence located in the house that could assist in the investigation. The items included bingo cards and a pink notebook on top of a grandfather clock in the entranceway in which Mr. Shelton kept records of the alleged skimming operation. Cheryl turned over to the investigators the videotape that her sister had made during their visit to the house two days earlier. The agents advised Cheryl that they desired her to obtain any evidence of the alleged skimming operation, particularly the pink notebook.

Over the next several months, Cheryl visited the home several times and retrieved evidence that she thought would assist in the investigation. She would also pick up her mail and other personal items during these visits. On some occasions she was accompanied by her daughter. On others, she was accompanied by her sister or Defendant Sue Carnathan.

On May 10, 1997, Cheryl retrieved two pages from the pink notebook and provided them to government agents. The record also reveals the following entries into

the home and corresponding evidence obtained:

1. May 22, 1997—12 photos of skim records and 3 photos of boxes of bingo cards.

2. May 29, 1997—24 photos of boxes of bingo cards, promissory note drawn by Jimmy Doug Shelton to pay Billy Shelton $100,000 in $2,500 monthly payments, handwritten schedule of $97,500 of $2,500/mo. payments, a receipt dated December 3, 1996, showing a $2,500 payment to Billy Shelton, and a typed payment schedule dated November 6, 1995 to October 18, 1996.

3. July 22, 1997—bingo paper packing slip

4. July 31, 1997—pink notebook; agents copied the notebook and Cheryl returned it to the top of the grandfather clock.

5. August 1, 1997–at Sue Carnathan's request, Cheryl accompanied Carnathan to the house so Carnathan could pick up some illegal bingo cards.

6. August 6, 1997—note signed by Jon Shelton regarding the "exact amount" on the paperwork and bingo session sheets for January 25 and 26, 1997, and February 2, 1997.

7. August 7, 1997—furnished skim records and envelope of August 1, 1997, skim record to agents who photocopied.

8. August 8, 1997—volunteer invoice/packing slip dated June 17, 1997, for bingo cards sold to "Bob Harrison."

The record also demonstrates that on at least three occasions, Cheryl Shelton made use of the house to participate in the very skimming operation with regard to which she was removing evidence. On two of

these occasions, in September and October of 1997, Cheryl Shelton altered bingo session sheets with the knowledge, and at the direction, of Mr. Shelton. The defendant was at that time trusting that Cheryl was still a co-conspirator.

At no time did Mr. Shelton attempt to limit Cheryl's access to the home or the evidence in question. Cheryl's key and access code were the same she had always had. Likewise, incriminating evidence was kept in the same locations. Mr. Shelton knew that Cheryl frequented the residence and that the evidence in question was easily accessible to her. However, there is no evidence to indicate that he made any attempt to exclude her. At all relevant times, Cheryl Shelton remained the lawful wife of Jimmy Doug Shelton.

## LEGAL ANALYSIS

The issue presented for this Court's consideration is whether Jimmy Doug Shelton's Fourth Amendment rights were violated when the government obtained access to the evidence through the cooperating witness without a warrant. The defendant's principal contention is that Cheryl became an "agent" of the government for Fourth Amendment purposes, and, therefore, could not do what the government investigators themselves could not do. Moreover, according to the defendant, Cheryl Shelton did not have the adequate authority to consent to a search.[1] As a result, the defendant argues, each entry and acquisition of evidence by Cheryl Shelton constituted an unreasonable search in violation of Mr. Shelton's Fourth Amendment rights.

The Fifth Circuit visited a similar set of facts in *United States v. Jenkins*, 46 F.3d 447 (5th Cir.1995). In *Jenkins* an employ-

ee of a distributer of allegedly obscene videotapes became a cooperating government witness in the criminal investigation of his employer. Over a five week period, the employee allowed the FBI to examine and copy a number of the videotapes that came into his possession. In holding that no Fourth Amendment violation occurred, the court recognized a simple, yet cogent principle: One who possesses the authority to engage in certain conduct before becoming an "agent" of the government may continue to engage in the same conduct without implicating the Fourth Amendment. In the Fifth Circuit's words, "becoming an 'agent' for purposes of Fourth Amendment analysis does not terminate one's right to engage in conduct which was authorized prior to entering the agency relationship." *Jenkins*, 46 F.3d at 460. Thus, because the employee maintained the same actual and apparent authority over the videotapes before and after his initial cooperation with the government, his conduct in turning over the disputed materials to the FBI did not violate the Fourth Amendment. The relevant inquiry, therefore, is whether Cheryl Shelton possessed the adequate authority such that she could have consented to a search in her own right which would have yielded the evidence at issue at the time of her agreement with the government. If so, whether or not she became an "agent" of the government is irrelevant because such conduct does not violate the Fourth Amendment. *Id.*

I. Third–Party Consent & Assumption of the Risk

 The Fourth Amendment protects against government infringement of a reasonable expectation of privacy. *U.S. v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80

---

1. The defendant concedes that Cheryl Shelton's consent to cooperate with the govern-
ment was voluntary. (Def. Supplemental Memorandum at 1).

L.Ed.2d 85 (1984). There are two requirements for the existence of a privacy interest protected by the Fourth Amendment: "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). Thus, a citizen is not protected from every "search," but, only searches that are "unreasonable." *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

■ Although warrantless searches are generally prohibited, it is well settled that a search pursuant to consent is not unreasonable for purposes of the Fourth Amendment. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Moreover, the authority to consent is not limited to the defendant, but may exist in third parties who possess "common authority" over or other "sufficient relationship" to the premises or effects sought to be inspected. *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

> The consent of one who possesses common authority or effects is valid against the absent, nonconsenting person with whom that authority is shared.... The authority which justifies the third-party consent... rests... on the mutual use of the property by persons generally having access for most purposes, so that it is reasonable to recognize that any co-inhabitant has the right to permit inspection of his own right and that others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. 988. The hallmarks of third-party consent, then, are common authority or a sufficient relationship to the premises and assumption of the risk. As one court has succinctly stated, the inquiry is a "multi-factored factual question that turns on the access, use, and reasonable expectations of the parties involved." *United States v. Ramirez,* 115 F.Supp.2d 401, 408 n. 14 (S.D.N.Y.2000) (quoting *United States v. Perez,* 948 F.Supp. 1191, 1200 (S.D.N.Y.1996)).

■ Applying these principles, the Court is of the view that the facts in the instant case militate even more heavily against suppression than the scenario in *Jenkins.* Cheryl Shelton enjoyed full and free access to the house at all relevant times. She also retained a key, an alarm access code and personal belongings at the residence. Further, this case involves a spousal relationship, unlike the employer/employee relationship in *Jenkins.* A purview of third-party-consent cases in federal courts reveals that the particular type of relationship becomes important inasmuch as it bears upon the property at issue—that is, inasmuch as it bears upon a "sufficient relationship" to the premises and, in turn, the defendant's reasonable expectation of privacy.[2] Thus, at least one Circuit has employed a presumption that one spouse has the authority to consent to a search of all areas of the homestead. *United States v. Duran,* 957 F.2d 499, 505 (7th Cir.1992). The Seventh Circuit applied the presumption again, this time to a situation where the wife was no longer living at the home, in *United States v. Gevedon,* 214 F.3d 807 (7th Cir.2000). There, the estranged wife gave consent to authorities to search the marital home and detached garage even though she no longer lived there. According to the court:

**2.** It is, therefore, important with respect to the degree to which the defendant assumed the risk that the third party would consent to a search.

The clear and simple fact is that Jackie was still William's legal wife at the time she consented to the searches. Presumptively, then, she had the actual authority necessary for valid consent. William has not rebutted this presumption.

*Gevedon,* 214 F.3d at 811.

The government need not rely on the implement of a presumption in this instance, however. Certainly an opposite presumption does not exist. The record is clear; the defendant made no attempt whatsoever to limit Cheryl Shelton's access to the house, nor did he attempt to exclude her in any way from the evidence she obtained. Indeed, on at least one occasion, he asked if she would stay the night while he was out of town. On other occasions he had her over specifically to engage in the conduct with regard to which she was collecting evidence. In light of the evidence that Mr. Shelton not only failed to exclude, but even encouraged free access, the Court finds that Cheryl Shelton had actual authority to permit a search "in [her] own right."

Several courts have held that a spouse's consent may be effective even after leaving the marital home. For example, in *United States v. Trzaska,* 859 F.2d 1118 (2d Cir. 1988), the consent of an estranged wife was effective even though she had moved out of the apartment two weeks earlier. In that case, the wife accompanied the police to the apartment where they conducted a search. While gathering some of her personal belongings, she directed the officers to the location of her husband's weapons. The Court rejected the defendant's arguments that since she no longer lived there she had ceased to have "mutual use" or "common authority" over the premises searched and that her desire to pick up some personal belongings was insufficient evidence of such "mutual use." *Trzaska,* 859 F.2d at 1120. The court pointed to the fact that she had recently moved out, possessed a key to the residence, and did remove some personal belongings as sufficient to establish adequate authority.

Applying the Second Circuit's analysis to this case, Cheryl Shelton had the authority to consent to a search. Like the wife in *Trzaska,* she had also recently moved out and possessed a key. Moreover, she also had a security access code. The evidence demonstrates that, although Cheryl's primary purpose may have been to gather evidence against her husband, she too had her own purposes at the times in question; she picked up some of her personal belongings, checked for phone calls, and gathered her mail.

In a similar case, the Tenth Circuit held an estranged wife's consent effective although she was living with her parents at the time. *United States v. Crouthers,* 669 F.2d 635 (10th Cir.1982). In so holding, the court noted that she possessed a key and had not completely abandoned the marriage or the apartment. *Crouthers,* 669 F.2d at 643. The same factors are present with regard to Cheryl Shelton.

Although the factual milieu of cases in this area is particularly varied and intensive in nature, the general proposition that is borne out remains constant: a spouse who no longer lives in the marital home may nonetheless retain actual authority to consent to a search where, as here, there is other strong indicia of authority.[3]

**3.** For further illustrations of this principle, *see United States v. Brannan,* 898 F.2d 107 (9th Cir.1990) (wife's consent effective though husband had changed the locks where she was joint owner but from which she had recently moved when husband was arrested); *United States v. Long,* 524 F.2d 660 (9th Cir.1975) (although wife had moved out because of fear

█ The Court concludes, therefore, that the fact Cheryl Shelton was no longer residing at the house did not vitiate her authority to consent to a search in this case. The authority of one who has full access to a property is not diluted by actual non-use. Likewise, neither is that authority limited to certain areas, especially when a spousal relationship is involved. *See, e.g., Gevedon,* 214 F.3d at 811 (estranged wife's consent effective for search of the attic even though she had only entered it once where defendant failed to demonstrate he had excluded her from it); *Duran,* 957 F.2d at 506 (holding that where wife had key and access to a farmhouse which was used solely by her husband as a gym, the fact that she never entered or used the property, nor had any personal effects inside, did not eviscerate the effectiveness of her authority to consent to search).[4] Such reasoning has lead one prominent commentator to conclude that, under the *Matlock* test, the only effective way to prevent a spouse who has full access to the marital home from giving valid consent is for the property to be under the exclusive control of the non-consenting spouse and for the non-consenting spouse to deny access to the consenting spouse. 3 Wayne R. LaFave, *Search and Seizure,* § 8.4(a) at 762 (3d ed.1996). Neither circumstance is present here with regard to the evidence at issue. The defendant's argument that while Cheryl Shelton may have had free access to the house, she did not have such access, for instance, to the top of the grandfather clock or other areas in which the evidence was located is, therefore, dubious. The facts in the instant case are clearly inconsistent with such a conclusion, not only because areas such as the top of a grandfather clock in the entranceway can hardly be considered "exclusive," but, particularly in light of her participation as a co-conspirator in making the skim records and generating the evidence from the outset.

█ The defendant's attempt to distinguish some of the foregoing authorities on the basis of "ownership," moreover, is unconvincing. While it is true that some courts in third-party consent cases have weighed legal ownership as a factor in the applicable analysis, "ownership is not the *sine qua non* of authority to consent." *Jenkins,* 46 F.3d at 455. The law of property, "with its attendant historical and legal refinements," does not constitute the predicate on which the authority of the third-party consent rests. *Id.* at 455 (citing *Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. 988).

---

for her safety and husband had changed locks so that her key would not work, wife's consent to search was effective as she "had a joint right to control the house with her husband and in fact exercised that right at the time she accompanied the agents to the house by collecting her personal belongings from the house while the agents were conducting the searches"); *See also State v. Madrid,* 91 N.M. 375, 574 P.2d 594 (1978) (relying on *Matlock,* wife who had left home 5 months earlier could still consent where she had a key and had left personal effects there).

The Court notes that none of these cases involved a situation in which the non-consenting spouse facilitated use of the marital home to the consenting spouse in order to advance the alleged criminal enterprise. In this sense, any expectation of privacy Mr. Shelton may have had was even less reasonable.

4. *See also, e.g., United States v. Clow,* 26 M.J. 176, 187 (CMA 1988) (applying the same principle where an estranged spouse had left months earlier; "absent a clear showing that one spouse has 'exclusive use' of some area within the marital residence or of some desk, bureau, cupboard, or other piece of furniture located therein... a spouse's access to the marital residence should be treated as access to all parts of that residence and to the contents of any furniture or containers located there").

Indeed, the fact of non-ownership has not precluded valid consent on facts in which the third party's relation to the property is much more tenuous than the circumstances in the instant case. For example, in *U.S. v. Murphy*, 506 F.2d 529 (9th Cir.1974) (per curiam), an employee granted consent to authorities to search his employer's warehouse. Even though the employee had no status as a lessee of the property, much less an owner, and was given the key to the warehouse only on occasions when he was to perform work there, the court held his consent effective. *Murphy*, 506 F.2d at 529. In so holding, the court reasoned:

> In considering all of the circumstances surrounding the search, we attribute special significance to the fact that Murphy delivered the key to Tucker. We conclude that Tucker's custody of the key gave him sufficient dominion over the premises to enable him to grant the necessary consent. Since Murphy himself put the premises under the immediate and complete control of Tucker, who voluntarily consented to the search, we hold that the search was not unreasonable.

*Id.* In this case, Cheryl Shelton, likewise a non-owner of the property, but more than a mere employee, not only had a key, but her own alarm code, and unlike the employee in *Murphy*, was not limited by the defendant in her use of the premises. The Court finds that the fact of non-ownership in this instance, viewed in the "totality of the circumstances" did not operate to divest Cheryl Shelton of her authority or "dominion" over the premises.[5]

Nor does the fact that this case involves multiple entries on the part of Cheryl Shelton serve to sufficiently distinguish the case at hand. Again, the inquiry is whether she had authority such that she could have consented in her own right to a search of the premises at the time of the government agreement. Until that authority is vitiated, engaging in activity which she already had the right to engage in does not implicate the Fourth Amendment. Thus, it is irrelevant that the employee in *Jenkins* obtained evidence for the FBI on multiple occasions. He only continued doing that which he had already had the authority to do. Presumably, had that employee been fired or otherwise excluded during the time he was cooperating with authorities, he could not have thereafter gone back and obtained evidence if indeed he was found to be acting as an agent of the government. Only in one of two situations, then, would the inquiry as to whether he became an "agent" of the government become relevant: (1) if he did not possess the authority in the first place to consent to a search at the time he began cooperating; or (2) if he did have that authority at the outset, but somehow lost it and then proceeded to remove evidence anyway.

As in *Jenkins*, neither circumstance is present the case at hand. At no time during the period in which Cheryl removed evidence from the house can it be said that her authority which existed at the time of her agreement with the government was impaired. No intervening event such as a change of the locks, the taking back of the key and access code, the initiation of a legal proceeding effecting the status of the marriage, or even a communication that free access should no longer be enjoyed— all things easily within power of Mr. Shelton to effect—took place during the period in question.

---

**5.** With regard to the particular skimming records at issue, moreover, a claim of ownership on the part of Mr. Shelton as against his co- conspirators, among whom Cheryl Shelton was one, seems problematic.

Instead, the record reveals that Mr. Shelton encouraged the use of the premises during the relevant time period. Indeed, on at least three occasions during this period, Cheryl Shelton made use of the house to participate in the very skimming operation with regard to which she was removing evidence, with the knowledge of Mr. Shelton. On one occasion, in August of 1997, she accompanied defendant Sue Carnathan to the house so Carnathan could pick up some illegal bingo cards. On two more occasions, in September and October of 1997, Cheryl Shelton altered bingo session sheets at Mr. Shelton's direction. These facts exhibit not only continued access to the house, but also free access to the evidence at issue.

■ By his conduct in permitting such access to the residence as well as the incriminating evidence in question, Mr. Shelton assumed the risk that Cheryl Shelton would cooperate with authorities. In *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), the petitioner argued that the failure of the informant to disclose his role as government informant vitiated the consent the petitioner gave for the informant's access to evidence of criminal wrongdoing. *Hoffa,* 385 U.S. at 300, 87 S.Ct. 408. The Supreme Court rejected the argument because "the Fourth Amendment [does not protect] a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Id.* at 302, 87 S.Ct. 408. Therefore, the fact that Mr. Shelton would not have consented to a

cooperating witness having access to his house and records of his skimming operation, while "clearly true . . . is a red herring which has no effect on [Cheryl's] actual or apparent authority." *Jenkins,* 46 F.3d at 456. Because Mr. Shelton voluntarily revealed evidence of criminal wrongdoing to Cheryl Shelton, there was no reasonable expectation of privacy to invade.

■ Cheryl Shelton did not see or hear anything that Mr. Shelton did not either allow or intend for her to see or hear, nor did she overstep her access. Thus, the fact that her entries were gained based on an element of pretext is of no significance. It is well settled that the use of such pretext to gain access to evidence is permissible where, as here, the bounds of that access are not exceeded.[6] As in *Hoffa,* the defendant in this case was not relying on any expectation of privacy when he permitted free access to the house and evidence. Rather, he was relying upon a misplaced confidence that Cheryl would not reveal evidence of the skimming operation. *See Hoffa,* 385 U.S. at 303, 87 S.Ct. 408; *United States v. Tarrant,* 460 F.2d 701, 702 (5th Cir.1972). In short, Mr. Shelton had no reasonable expectation of privacy vis-a-vis his wife and co-conspirator Cheryl Shelton.

■ It appears the defendant would have the Court hold otherwise almost purely based on the seemingly surreptitious and deceptive nature of the conduct of Cheryl Shelton. In the defendant's

**6.** *See, e.g., Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966) (No Fourth Amendment violation where agent gained access to defendant's home based on pretext where he stayed within bounds of access provided and disclosed evidence voluntarily revealed); *Jones v. Berry,* 722 F.2d 443 (9th Cir.1983) (Ruse by IRS to gain access to defendant's skimming records was not a violation of Fourth Amendment where the agents

pretended to be fellow criminals in order to gain the confidence of the defendant); *United States v. Schuster,* 684 F.2d 744, 748–49 (11th Cir.1982) (No Fourth Amendment violation where third-party, who had become agent of the government, allowed Secret Service Agent to accompany him on visit to defendant's apartment where defendant had consented to third party's entry), *reh'g granted,* 697 F.2d 910 (11th Cir.1983).

view, such conduct should not be condoned. Indeed, the abuse of trust in this instance, by virtue of the spousal relationship, may exceed those cases where the confidant was merely an employee or friend. The Fourth Amendment, however, makes no such social judgements. For, "however strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities." *United States v. White,* 401 U.S. 745, 749, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).

## II. Apparent Authority

Finally, the Court notes that even if Cheryl Shelton lacked actual authority by virtue of her no longer residing at the house, government investigators were, at minimum, reasonable in the belief that she had the actual authority to consent to a search. Therefore, the exclusionary rule should not operate to exclude the evidence at issue. *See Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

Because the Court concludes that Cheryl Shelton possessed the authority to consent to a search at the time of her agreement with the government and throughout the relevant period, the question as to whether she became an agent of the government for Fourth Amendment purposes is irrelevant and the Court need not reach it. Simply put, her conduct did not implicate the Fourth Amendment.

## CONCLUSION

Based on the foregoing analysis, the Court respectfully declines to adopt the Honorable Magistrate's recommendation in this instance. Consequently, the defendant's Motion to Suppress the evidence at issue is denied. A separate order in accordance with this opinion will be so entered.