United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 8, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 02-60326

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JIMMY DOUG SHELTON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Mississippi

_____

Before JONES, WIENER, and DeMOSS, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellant Jimmy Doug Shelton ("Shelton") appeals the district court's denial of his motion to suppress evidence that his estranged wife, Cheryl Shelton ("Cheryl"), removed from his house and gave to law enforcement officials. On the basis of our close review of the record and our analysis of relevant authority, we hold that Shelton's Fourth Amendment rights were not violated by admission of evidence obtained for the government by Cheryl as a paid informant. Therefore, we affirm.

## I. FACTS AND PROCEEDINGS

After six years of marriage, Cheryl abruptly left the home that she shared with Shelton. She moved out because of an extra-

marital affair that Shelton was allegedly having with his secretary. When she left, Cheryl took some of her clothes and other possessions with her, but she left behind many other personal belongings, including, among other things, clothes, jewelry, photographs, and furniture. With Shelton's knowledge and assent, she also kept her house key and her personal security access code for the house alarm system. Although Cheryl never moved back into the house, she and Shelton were not legally separated during the period in question and neither party filed for divorce.

A few days after she moved out, Cheryl — together with her daughter, Camile Prather ("Camile") — returned to the former marital residence so that Cheryl could retrieve some more of her belongings. Camile videotaped boxes of bingo cards while she was in the house. At about the same time, Cheryl's sister, Debbie Wheeler ("Debbie") who had been cooperating with a government investigation of Shelton since the previous month, informed Cheryl of the on-going investigation of Shelton's bingo operations and encouraged her to speak with the government. Cheryl agreed and met with an IRS agent and an Assistant U.S. Attorney a week after she had vacated her marital home.

At that meeting, Cheryl volunteered to help the government with its criminal investigation of Shelton, testifying later that she "wanted to do the right thing" and that she "didn't want to get

2

in trouble."[1] The agents orally assured Cheryl that if she would assist in the investigation, she would not be prosecuted for her role in the alleged conspiracy and indicated that she would be compensated financially in some way.

Cheryl informed the government agents that there were items in Shelton's home that might further their investigation, including bingo cards in an upstairs bedroom and a notebook with records of the alleged skimming operation on top of a grandfather clock in the front hallway of the house. The government agents advised Cheryl of their interest in the notebook and any other items that she could obtain relative to the skimming operation, and Cheryl subsequently gave the government the videotape that Camile had made during their first visit to Shelton's residence together. After that initial visit, Cheryl returned to Shelton's house many more times, both on her own accord and at the specific direction of the government. She did so to obtain particular items of evidence for the benefit of the government's investigation, as well as to pick up her mail and personal belongings. She continued making visits to the house over a period of at least four months.

After Shelton was charged, he filed a motion to suppress, challenging nine specific visits to his house by Cheryl and the

_____

[1]Cheryl had been actively involved in the illegal skimming operation as a co-conspirator and, as explained infra, continued to alter the bingo session sheets, although at that point as a government agent, as late as October 1997.

items she had taken.[2]  In recommending that the district court grant the motion to suppress, the magistrate judge acknowledged that Shelton had made no attempt to limit Cheryl's access to the home, and noted that the items that Cheryl had taken from the home after she moved out were located in areas to which she had free access.  Emphasizing that Cheryl maintained no ownership interest in the home, however, the magistrate judge concluded that Cheryl's permission from Shelton to enter the home, although not limited spacially, was limited functionally to picking up her mail and personal belongings.  This, concluded the magistrate judge, limited the <u>purpose</u> of her authorized access.  Although she was entitled to retrieve personal items, ruled the magistrate judge, Cheryl's principal purpose in entering the home was not to pick up her mail and personal items, but to collect evidence against her husband at the direction of the government.  Consequently, reasoned the magistrate judge, her activities exceeded the limited purpose for

---

[2] The items retrieved are as follows: (1) 2 pages from the notebook; (2) 12 photos of skim records and 3 photos of boxes of bingo cards; (3) 24 photos of boxes of bingo cards, a promissory note of Shelton to pay his brother, Billy Shelton, $100,000 in $2,500 monthly payments, a handwritten schedule of $97,500 of $2,500 monthly payments, and receipt dated 12/03/96 showing a payment to Billy Shelton, and a typed payment schedule dated 11/06/95 to 10/18/96; (4) bingo paper packing slip; (5) the notebook, which was copied by agents and then returned to the top of the grandfather clock by Cheryl; (6) at the request of Sue Carnathan, who worked with Shelton, Cheryl accompanied her to the home to pick up some bingo cards; (7) note signed by Shelton's son, John, regarding the "exact amount" on paperwork and bingo session sheets; (8) skim records and an envelope of skim records delivered to agents for photocopying; and (9) invoice/packing slip for bingo cards sold to "Bob Harrison."

4

which she was allowed into the home by Shelton, and thus constituted unlawful searches.

Despite the recommendation of the magistrate judge, the district court denied Shelton's motion to suppress.[3] The court found that Shelton had neither attempted to limit Cheryl's access to the home nor attempted to exclude Cheryl in any way from access to the evidence that she obtained and turned over to the government.[4] The court held that Cheryl had actual common authority to permit a search by agents of the government and to deal directly with the contents of the house.[5]

After the court denied his motion to suppress, Shelton agreed to plead guilty to one count of the superseding indictment, viz., filing a false tax return for his bingo operation. As part of the agreement, Shelton consented to the forfeiture of the bingo building and $303,718.73, subject to pending forfeiture actions, but reserved the right to appeal the denial of his motion to suppress evidence and, if successful, to withdraw his guilty plea. Shelton was sentenced to nine months imprisonment, one year of supervised release, and a fine of $20,000. He timely filed a notice of appeal.

## II. ANALYSIS

[3] United States v. Shelton, 181 F. Supp. 2d 649 (N.D. Miss. 2001).

[4] Id. at 655.

[5] Id. at 656-58.

A.    **Standard of Review**

When hearing an appeal from a district court's ruling on a motion to suppress, we review that court's factual findings for clear error and its ultimate conclusion about the constitutionality of the law enforcement conduct de novo.[6]  We consider the evidence in the light most favorable to the prevailing party, here the government.[7]

B.    **Authority to Grant Consent**

Valid consent to a search is a well-established exception to the normal requirement that law enforcement officers must have a warrant grounded in probable cause before conducting a search.[8]  In United States v. Matlock, the Supreme Court extended to third parties the ability to grant this consent when those third parties "possess[] common authority over or other sufficient relationship to the premises or effects sought to be inspected."[9]  "Common authority," the Court explained

> is, of course, not to be implied from the mere property interest a third party has in the property.  The authority which justifies the third-party consent...rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that

---

[6]United States v. Orozco, 191 F.3d 578, 581 (5th Cir. 1999).

[7]Id.

[8]Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).

[9]415 U.S. 164, 171 (1974)(emphasis added).

6

one of their number might permit the common area to be searched.[10]

Based on this definition and even a cursory glance at the facts, we have no doubt that if government agents had searched Shelton's home with Cheryl's consent while she was still living there, their search would have been lawful: She unquestionably would have had the authority —— "common authority" with Shelton —— to permit a search encompassing such common areas as the front hallway, where the skimming notebook lay on top of the grandfather clock, and an upstairs bedroom, where the illegal bingo cards were stashed. The same would have held true for anything that she might have removed from the house and turned over to the government. This is so because, even though Cheryl never had an ownership interest in the house, she was Shelton's wife and had shared its occupancy with him for at least six years.[11] Shelton left the bingo operation's materials in common areas of the house, demonstrated no intention to conceal those items from Cheryl, and, in fact, continually solicited her active participation in the skimming operation. All of these factors would have given Cheryl "joint access or control for most purposes," as long as she resided in the

---

[10]Id. at 171, n.7.

[11] In Matlock, the Court expressly downplayed the significance of property ownership when deciding whether a third party possessed common authority to consent. 415 U.S. at 171, n.7 (stating that "[t]he authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements").

house with Shelton as husband and wife.

The only difference between this hypothetical example and the actual facts of the instant case is that Cheryl had moved out of the marital residence one week before she agreed to assist the government in its investigation. Thus, the precise issue presented here is whether Cheryl maintained the same (or sufficient) common authority to consent to this search, beginning a mere week after she had vacated the house and continuing for the next four months, during which time she took evidence from Shelton's house and gave it to the government. Although she did not literally usher government agents into the house so that they could conduct their own search, Cheryl effectively allowed them to search the premises by acting as their agent in collecting and delivering items of evidence for them during that period and at their express direction and control.

Shelton argues on appeal (as he did in the district court) that by using Cheryl as a paid informant for the purpose of conducting warrantless searches of his home, the government violated his Fourth Amendment rights. He insists that Cheryl lacked common authority under Matlock and Rodriquez. Even though with his knowledge and acquiescence, Cheryl continued to possess a key and security access code, contends Shelton, her authority to enter his home was narrowly restricted to picking up her mail and retrieving personal belongings; and, as a result, he retained a reasonable expectation of privacy in his home for all other

8

purposes and to all other extents. This privacy interest was violated, Shelton asserts, because Cheryl's principal reason for entering his home was to gather evidence for the government, not to pick up her mail and her personal effects. Shelton relies heavily on the magistrate judge's determination that he "clearly did not consent to a paid government informant entering his home to retrieve other than personal items."

For its part, the government maintains that Shelton lost any expectation of privacy vis-à-vis Cheryl when he made her a co-conspirator in his bingo skimming and tax fraud schemes, and used their matrimonial domicile to store illegal bingo cards and conceal records of fraudulent activities. Inasmuch as Cheryl enjoyed unlimited physical access to the entire interior of the home, without any interference from Shelton or even any requirement that he be present, left her personal possessions in the home, and retained her key and access code, argues the government, Cheryl was vested with actual and apparent authority to obtain the evidence from the house and deliver it to the government.

Even though we are aware of no case in which a court has confronted essentially identical factual circumstances, the Supreme Court and other federal circuit courts have addressed similar cases, giving us at least a degree of guidance. In the process of establishing the rule of <u>apparent</u> common authority, the Supreme Court in <u>Illinois v. Rodriguez</u> determined that the third party in question, the girlfriend of the defendant Rodriguez, lacked <u>actual</u>

common authority over defendant's apartment.[12]  The Court based its conclusion on several discrete factors: (1) The girlfriend had lived at the apartment with her two children for approximately six months; (2) she and her children had moved out of defendant's apartment a month before the search took place; (3) she had not contributed to rent and was not on the lease; (4) she occasionally spent the night at the apartment with Rodriguez but never went there alone and never invited friends over; (5) she took her and her children's clothing with her when she moved out, but left some furniture and household effects; and (6) she had a key to the apartment, but might have taken it without defendant's knowledge.[13]

The facts of this case are readily distinguishable.  In contrast to the girlfriend in Rodriquez, Cheryl had been married to Shelton for six years; neither of them took any legal steps to separate or divorce; she shared his house with him as the marital residence for at least the same amount of time as they were married; she moved out only one week before agreeing to collect evidence for the government;  and after moving out, she visited the house in Shelton's absence at her will, either alone or with members of her family.  These facts establish a much more substantial connection to the premises than that of the defendant's girlfriend in Rodriquez.

---

[12] 497 U.S. 177, 181-82 (1990).

[13] Id. at 181.

10

In United States v. Smith, we rejected a challenge to the third-party consent given by the estranged wife of the defendant.[14] Although she was estranged, the wife was present, in the defendant's absence, when the police first visited the home.[15] We noted additionally that she was co-lessee of the house, and that during the divorce proceedings, she was granted exclusive possession of the home.[16] Similarly, in United States v. Koehler, a car-search case, we concluded, on the basis of particular factual circumstances, that the wife had common authority to permit the police to search a car driven almost exclusively by her husband.[17] Although prior to his arrest, the husband had strictly limited his wife's access to the car, we concluded that this fact was outweighed by evidence that (1) the wife was the legal owner of the car, (2) the husband allowed his son to drive it, and (3) the husband did not object when his wife was given the keys to the car by a police officer.[18] In short, our cases addressing third party

_____

[14] 930 F.2d 1081 (5th Cir. 1991).

[15] Id. at 1083.

[16] Id. at 1085.

[17] 790 F.2d 1256, 1259-60 (5th Cir. 1986).

[18] Id. Here, the magistrate judge, the district court, and both parties on appeal also discuss the relevance of our decision in United States v. Jenkins. 46 F.3d 447 (5th Cir. 1995). While Jenkins is similar to the extent that a third party became a government agent and consented to the search of defendant's videotapes, it is quite distinct factually. It involved an employer-employee relationship, in which the items searched were shipped to the employee and were in his sole possession when he

11

consent by a defendant's spouse are also factually distinct from this case and demonstrate a closer connection of the third party to the area searched than exists here.

Several other courts have addressed and upheld instances in which a wife, sometimes estranged, has consented to a search of the residence in which her defendant-husband lived; but none of the circumstances in those cases closely mirror the ones now before us.[19] Only the Second Circuit has upheld such a search under fairly analogous facts. In <u>United States v. Trzaska</u>, that court sanctioned a third-party consent search, because (1) the wife had

permitted the government search. <u>Id.</u> at 449-50, 456. These differences, we conclude, are significant enough that <u>Jenkins</u> is at most of limited usefulness in our analysis.

[19] <u>See</u> <u>United States v. Gevedon</u>, 214 F.3d 807, 809, 811 (7th Cir. 2000) (finding that the estranged wife had common authority to consent to a search of a garage next to the house, when the wife had moved out of the house several months earlier, but a court had subsequently given her sole possession of the house and garage); <u>United States v. Duran</u>, 957 F.2d 499, 503-04 (7th Cir. 1992) (upholding the common authority of a wife to consent to a search of a farmhouse adjacent to her marital residence, even though she had no ownership interest in the property, never used the farmhouse, and had no possessions there); <u>United States v. Brannan</u>, 898 F.2d 107, 108 (9th Cir. 1990) (concluding that an estranged wife had common authority to consent to a search of the house of which she was joint-owner, even though she had moved out two or three months beforehand and defendant had changed the locks); <u>United States v. Crouthers</u>, 669 F.2d 635, 642-43 (10th Cir. 1982) (upholding the common authority of a partially estranged wife to consent to a search of the house, when she had moved out two weeks before the search, she still had a key, and she had been present at the house with her husband); <u>United States v. Long</u>, 524 F.2d 660, 660-61 (9th Cir. 1975) (holding that an estranged wife had common authority to consent to the search of the jointly owned house, when she removed possessions on the days of the search and, and despite the fact that she had moved out weeks beforehand and defendant had changed the locks).

12

moved out of the apartment she shared with her husband only two weeks before the search, (2) she still possessed a key to the apartment, and (3) she removed some personal belongings from the apartment on the day of the search.[20]  Trzaska, however, neither indicated the wife's legal relationship to the property nor involved multiple trips to the house as a government agent for the principal purpose of obtaining evidence against the defendant husband.

Considering all of these cases together, the only rule that emerges is that the validity of a search grounded in third-party consent requires an intensely fact-specific inquiry, and that slight variations in the facts may cause the results to vary. Consequently, the question that here remains unanswered is whether Cheryl's nexus with Shelton's house, on its own terms and conditions, amounted to a "sufficient relationship to the premises" or "joint access or control for most purposes."[21]  The Supreme Court has only briefly elaborated that this standard requires us to determine whether it is "reasonable to recognize that [Cheryl] has the right to permit the inspection in [her] own right," and whether Shelton "assumed the risk that [Cheryl] might permit the common area to be searched."[22]  Post-Matlock cases, such as Rodriquez,

---

[20]859 F.2d 1118, 1119-20 (2d Cir. 1988).

[21] Matlock, 415 U.S. at 171 & n.7.

[22] Id. at 171, n.7.

13

<u>Smith</u>, <u>Koehler</u> and <u>Trzaska</u>, demonstrate though that this formulation has led to very fact-oriented precedents, none of which truly govern this case. Given that the <u>Rodriguez</u> Court found actual common authority lacking under its facts, but that <u>Smith</u>, <u>Koehler</u> and <u>Trzaska</u> upheld common authority under their respective circumstances, the body of case law fails to furnish a clear governing principle for deciding this case.[23]

To better understand the scope of the <u>Matlock</u> standard and, more importantly, how it applies to this case, we find it useful to examine the privacy interests that animate the rule of third party consent. Although consent to a search is a well-established exception to the requirement for a warrant issued on the basis of probable cause, courts have left the theory underlying this rule largely unarticulated. The validity of a consensual search is presumably based on the premise that a warrant and probable cause are unnecessary to justify the invasion of privacy that accompanies a consensual search, because by consenting, the individual evinces a voluntary willingness to forgo that privacy. Similarly, third party consent presumably extends the capacity to give consent to individuals to whom the one with the privacy interest has already substantially ceded his expectation of privacy. For example, when

---

[23] We recognize that <u>Rodriguez</u>, which rejected common authority, concerned a defendant's girlfriend, and these other cases, which found such authority, concerned defendants' spouses; but, without more, we cannot conclude this distinction alone determines whether a third-party consent is permissible.

14

A allows B to intrude on A's expectation of privacy, A is essentially granting B a particular level of access and control over A's area of privacy, and is thereby assuming the risk of B's exposing A's interest to others. Thus, it is the interest of the defendant (A in our example) and the extent to which he either retains or forgoes his expectation of privacy that substantially informs our understanding of common authority in third-party consent situations.[24]

Viewing third-party consent through the prism of privacy interests enables us to approach the question of common authority by asking whether A sufficiently relinquished his expectation of privacy to B, i.e., allowed mutual or common use of the premises to the extent of joint access and control for most purposes, so that it is reasonably anticipated that B might expose the same privacy interest to others, even including law enforcement officers. To determine here whether and to what extent Shelton actually relinquished his expectation of privacy to Cheryl, we find it

---

[24] See Duran, 957 F.2d at 504 (finding that "[p]rivacy interests, and the relinquishment thereof, also play prominently" when explaining the notion of common authority in third party consent cases). Relying solely on the words "joint access or control for most purposes" can be misleading, because it directs our focus solely to the third party's independent control of premises, rather than to the defendant's initial decision to open his privacy interest to the third party and thereby grant that individual access and control over those interests. Although a third party's independent control of an area or personal effect can, and does, influence whether that individual has common authority to consent to a search, when a defendant also controls that same area or personal effect, an analysis of his expectation of privacy frequently will be necessary.

15

helpful to borrow from the well-established "search" standard, by asking whether Shelton showed a subjective expectation of privacy that society is prepared to accept.[25] If the answer is yes, then Cheryl would not have a connection to the premises sufficient to give her common authority to open them to others. Again, we find this approach useful, at least in this case, because it highlights the abandonment-of-privacy rationale that underlies and fundamentally justifies consensual searches. Indeed, our focus on the conduct of the defendant (Shelton), rather than the conduct of the third party (Cheryl), is sensible because it is the defendant's Fourth Amendment rights that are at stake in such situations.[26]

Again, Shelton now insists that after Cheryl moved out, her access to his house was strictly limited to retrieving her belongings and picking up her mail. In light of all the facts, we disagree. Had he truly wanted to limit her access to these purposes only, Shelton could have revoked Cheryl's security code, changed the locks, and set up an appointment for her to pick up her

---

[25] As reiterated in Kyllo v. United States, no Fourth Amendment search occurs "unless the individual manifested a subjective expectation of privacy in the object of the challenged search, and society [is] willing to recognize that expectation as reasonable." 533 U.S. 27, 33 (2001) (citations and internal quotation marks omitted).

[26] See Stoner v. California, 376 U.S. 483, 489 (1964) (stating that "[i]t is important to bear in mind that it was the [defendant's] constitutional right which was at stake here, and not the night clerk's nor the hotel's"). See also Katz v. United States, 389 U.S. 347, 351 (1967) (finding that "the Fourth Amendment protects people, not places").

16

things while he was present at the house.  Just as Shelton put aside Cheryl's mail, he could have collected her personal belongings for her to pick up at one time.  He could even have left her mail outside the house or taken it to his office and given it to her sister, who worked there.

Rather than take any of these precautions, however, Shelton did nothing to suggest that Cheryl's access to the house was restricted to the extent that he now contends, or that he had re-established his expectation of privacy vis-à-vis her curtailed use of the house after she moved out.  In essence, nothing changed. The great weight of the evidence supports the conclusion that Shelton never altered his position toward Cheryl's use of the house after she moved out, and that his low expectation of privacy relative to her continued unchanged.  Having been married to Cheryl and having shared his home with her for at least six years, Shelton never asked her to vacate the house in the first place; she left on her own volition because of his purported marital infidelities.  He never filed for separation or divorce; he never changed the locks or revoked Cheryl's personal security code; he was aware that Cheryl returned to the house from time to time, and he sorted her mail for her; he apparently invited her to stay at the house on one occasion when he planned to be out of town; he never changed the locations of incriminating evidence of the bingo operation from the places where they were kept while she was living at the house; and — perhaps most importantly — Shelton never ceased his efforts to

involve her in the alleged skimming operation even five months after she moved out. Thus, contrary to the magistrate judge's conclusion, there is practically no evidence in the record that Shelton tried to restrict Cheryl's access to the house or to limit the reasons for which she could enter it. By continuing to allow Cheryl free access to the house, and by continuing to involve her in the skimming operation, Shelton demonstrated that he held no subjective expectation of privacy toward her at any time, either before or after her move.

Neither was Shelton's expectation that Cheryl would keep the bingo operation materials private reasonable. "It is well settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities...."[27] Although Shelton might have expected that, for her own best interests, Cheryl would not divulge information or evidence about their illegal activities, the Fourth Amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it."[28] Indeed, as an accused philanderer, Shelton might have done well to heed the admonition of the playwright William Congreve regarding a

---

[27] United States v. Jacobsen, 466 U.S. 109, 117 (1984).

[28] Hoffa v. United States, 385 U.S. 293, 302 (1966). See also Jacobsen, 466 U.S. at 117.

18

woman scorned.[29]

Even though the cases from which these principles derive concerned whether the police conduct at issue implicated the Fourth Amendment at all, rather than whether the police violated an established Fourth Amendment right, they nonetheless support the conclusion that Shelton could not reasonably expect Cheryl to keep the bingo operation materials in confidence. Like the defendants who exposed their illegal conduct to government informants in these earlier cases, Shelton voluntarily enlisted Cheryl in the illegal skimming operation by having her alter the bingo session sheets and by having her sign fraudulent tax forms.

In addition, Shelton's proffered belief that Cheryl was only picking up mail and personal belongings on her house visits does not mean that Cheryl's conduct amounted to potentially impermissible trickery or deception.[30] This is not a case in which law enforcement officers gained access to the house by posing as individuals engaging in law-abiding activities, such as a repairman for a utilities company. Rather, Shelton actively involved Cheryl

---

[29] William Congreve, <u>The Mourning Bride</u>, act 3, sc. 8 (1697) ("Heaven has no rage like love to hatred turned, Nor hell a fury like a woman scorned").

[30] <u>See</u> <u>Lewis v. United States</u>, 385 U.S. 206, 211 (1966) (indicating that not every entry to premises by invitation authorizes "an agent...to conduct a general search for incriminating materials"); <u>Gouled v. United States</u>, 255 U.S. 298, 306 (1921) (<u>overruled</u>, <u>in part</u>, <u>on other grounds</u>) (finding that a search by a government agent who enters a home or office "by stealth, or through social acquaintance, or in the guise of a business call" is prohibited by the Fourth Amendment).

in, and exposed her to, the precise illegal conduct for which the government sought evidence.

Finally, neither Cheryl's principal purpose of procuring evidence for the government instead of picking up personal belongings, nor the absence of her intention of returning to the marriage —— even if true —— precludes our concluding that she maintained common authority, because it is not <u>her</u> subjective intention that controls our decision. As discussed above, the validity of third-party consent depends in principal part on the extent to which the defendant forgoes his reasonable expectation of privacy toward that third party. Thus, although the intentions of the third party may carry some weight, it is the defendant's treatment of his own privacy interests that predominates in the determination of the third party's right to consent. Shelton's decision to solicit Cheryl's assistance in the bingo operation, and at the same time to perpetuate her essentially unrestricted access to the house, on par with the access that she had enjoyed while residing there as his spouse, is what vested Cheryl with common authority to consent to a search.

As today we hold that Cheryl possessed common authority to consent to the government's search, i.e., to remove the bingo operation materials from Shelton's house and deliver them to the government, we need not address the issues of limited authority and apparent authority raised by the parties.

### III. CONCLUSION

20

We agree with the district court that Cheryl possessed common authority to consent to a search of Shelton's house. That this manifested itself in her going into that house and taking evidence out of it for the government rather than allowing the government agents to enter the house themselves is of no moment. The result is the same, either way. Shelton's Fourth Amendment rights were not violated, so the district court's refusal to exclude those items from the evidence was not error. For these reasons, Shelton's conviction on his guilty plea and his resulting sentence are, in all respects,

AFFIRMED.