[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT**
**November 5, 2003**
**THOMAS K. KAHN
CLERK**

No. 03-10691

D. C. Docket No. 02-20055-CR-JLK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEFFREY BACKUS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(November 5, 2003)**

Before CARNES, BARKETT and DUHE*, Circuit Judges.

CARNES, Circuit Judge:

Jeffrey Backus pleaded guilty to and was convicted of possessing a firearm

---

* Honorable John M. Duhe, Jr., United States Circuit Judge for the Fifth Circuit, sitting by designation.

and ammunition after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).  The guilty plea was conditioned on Backus being allowed to appeal the denial of his motion to suppress the results of a search of his home.  That search, which turned up firearms and ammunition proving Backus' guilt of the crime of possessing them, was conducted with the express consent of his estranged wife.  This is Backus' appeal from the denial of his motion to suppress, and it brings to us an interesting Fourth Amendment issue arising out of a domestic abuse situation.

I.

The law is settled that permission to conduct a consensual search of property owned or occupied by a prospective defendant may be obtained from another person who possesses "common authority over or other sufficient relationship to the premises." See United States v. Matlock, 415 U.S. 164, 171, 94 S. Ct. 988, 993 (1974); see also Coolidge v. New Hampshire, 403 U.S. 443, 487-90, 91 S. Ct. 2022, 2048-50 (1971). The Supreme Court has explained that common authority for purposes of consent to search is not determined merely by property law, but "rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his

2

own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Matlock, 415 U.S. at 171 n.7; 94 S. Ct. at 993 n.7.

Under this common authority doctrine, a spouse who jointly owns and occupies the marital home with the defendant may consent to a search of it with the same effect as if the defendant himself had done so. See id. at 177, 94 S. Ct. at 996; United States v. Thompson, 421 F.2d 373, 376 (5th Cir. 1970)[1]. The issue in this case is whether the consent of an estranged wife who still jointly owns the marital home with the defendant, but who has not been in that home in some time, is effective against the defendant. Because the answer may depend on the factual circumstances of the wife's absence, we turn to them.

## II.

Sylvia and Jeff Backus were married in 1990 and began their life together in Miami.[2] Within a month after they joined together in matrimony, Backus began

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), this Court adopted as binding precedent all published decisions of the former Fifth Circuit issued before October 1, 1981.

[2] All of the facts contained in this opinion are taken from the record, and most come from the evidentiary hearing that the magistrate judge conducted on the motion to suppress. After conducting that hearing, the magistrate judge observed: "There doesn't seem to be much disagreement on the facts in the case, are there?" Counsel for Backus responded: "No, sir. I

verbally and physically abusing Mrs. Backus. He repeatedly screamed at her and made threats. Among the threats were that he would put bullets through her kneecaps and in her stomach so that she would be in a wheelchair and have to eat powdered mixes through a bag for the rest of her life. There was also a lot of physical abuse, and it escalated over time. Sometimes Backus shoved Mrs. Backus and pulled her hair, sometimes he put her in a headlock, and sometimes he punched her. She was afraid of him throughout their ten years of marriage. After it was over Mrs. Backus testified, with considerable understatement, that her marriage to Backus had been "tough to say the least."

It was tough on the children, too. Mrs. Backus had three sons, two of them from an earlier marriage. Her firstborn was Gabriel, who was seven years old when she and Backus married. Her secondborn's name is not disclosed in the record, but the record does reveal that the children's services agency took that child away from Backus and her in 1995, and gave custody of him to Mrs. Backus' mother. Mrs. Backus understood that was done because she had not protected the child from her husband. The third son, who was born to the couple soon after they married, was named Jeffrey, Jr.

---

don't believe that there are." Our reading of the record confirms that the facts, which we set out in this opinion, were undisputed at the time the motion to suppress was denied by the district court following the evidentiary hearing that the magistrate judge had conducted.

Backus abused his namesake child, Jeffrey, as well as Jeffrey's half-brother Gabriel, who also lived with the couple. He would hit the two boys, sometimes with a shoe. He would also withhold food from them when he was mad. On occasion, he would make young Jeffrey sleep on the bathroom floor to punish him for making mistakes during the night. Backus' abuse of Jeffrey got worse around the time that he was seven years old. It was then that Backus beat Jeffrey with a shoe so badly that Mrs. Backus took him to the hospital. Photographs were taken of Jeffrey's bruises, and the shoe that had been used in the beating was given to the authorities. Backus was charged with aggravated child abuse, but to Mrs. Backus's shock that charge was later dropped. She never understood why.

Mrs. Backus was afraid that if she divorced Backus, he would get visitation rights with Jeffrey. Throughout their marriage Backus had threatened that if she tried to divorce him he would take Jeffrey away so that she would never see him again. Mrs. Backus believed that would happen, which is why she stayed married to Backus for a decade. As she put it, "I would have died first before I would let him have Jeffrey."

The abuse continued and escalated throughout the marriage, although the venue of it changed in 1996. That year Mr. and Mrs. Backus, who had been living in an apartment together, jointly purchased a two-level townhouse, had the deed

5

made out in both of their names, and as co-owners lived there along with Jeffrey and Gabriel. They lived together in that Miami townhouse until what Mrs. Backus describes as "the breaking point" occurred in April of 2001.

On Saturday, April 7, 2001, Backus and Gabriel, who was then around 18 years old and a senior in high school, got into a fight. It ended when Gabriel left and went to live at a friend's house. After Gabriel left, Backus called Mrs. Backus on her cell phone and screamed at her. The next night, Mrs. Backus and Jeffrey went to dinner and did not return to the townhouse until around 11:00 p.m. When they got back Backus was still screaming about the fight with Gabriel. For awhile Mrs. Backus had been sleeping on the couch downstairs in an attempt to avoid her husband's anger, and she tried that again. This time it didn't work.

Around 4:00 a.m. the next morning, Monday, April 9, 2001, Mrs. Backus awoke to her husband screaming, grabbing her by the hair, and throwing her onto the floor. While she was on the floor, he hit her over the head with a flashlight. He then threw a vase at her. She blocked the vase with her leg. As a result of this assault, Mrs. Backus suffered a hairline fracture and bruises to her leg, which have never healed. She still has problems with that leg. She also had bumps on her head and headaches from the blows there. That was the attack which convinced Mrs. Backus to leave.

6

Backus did not want his wife and son to leave. She effected their escape that Monday morning by leading Backus to believe that she was taking Jeffrey to school; Backus apparently did not realize that it was Spring break. Due to the nature of the ruse, Mrs. Backus was able to take her purse, cell phone, and keys, but nothing more. Left behind were all of her and Jeffrey's clothes except what they had on, all of his toys (he was 10 or 11 years old then), and all of their personal belongings, including some of her jewelry. She described what they left behind as: "Everything. Everything." They even had to leave behind their pets, including what Mrs. Backus described as "a favorite cat," which she had for ten years. Jeffrey had a puppy that he wanted to take with him, so he went upstairs and told his father that they wanted to take the little dog for a walk. Backus must have been suspicious, because he wouldn't allow the boy to take the puppy. As Mrs. Backus figured it, "He kept the dog hostage, basically." The little hostage had to be left behind when Mrs. Backus and Jeffrey fled.

Later that day, Backus called Mrs. Backus on her cell phone and screamed for her to bring Jeffrey home. True to the profile of an abused wife, Mrs. Backus began having second thoughts about leaving and that night considered returning to Backus. She later explained that, after years of abuse, what she had been going through with him seemed normal to her. Young Jeffrey, however, did not want to

go back. He became hysterical and begged not to return. Mrs. Backus knew that if she went back, "there was going to be consequences for me to pay," because when Backus "gets mad, he gets mad."

Instead of returning home, Mrs. Backus and Jeffrey fled to Chicago where they stayed in shelters for abused wives and children for the next six months. During that period Mrs. Backus made two trips back to Miami. The first one was two weeks after they had left. She and Jeffrey had to return because the children's services agency was threatening to file neglect charges against her and take Jeffrey away because she did not have him in school. The agency wanted to see Jeffrey. She and Jeffrey came back to straighten out that problem, which she ultimately did by putting Jeffrey in school in Chicago. During that trip back to Miami, they did not return to the townhouse and Backus, but instead stayed with Mrs. Backus's friends. Backus apparently did not know they were in Miami.

Mrs. Backus also took this opportunity of being in Miami to file a police report with the domestic violence unit of a local law enforcement agency about the April 9, 2001 assault that had led to her and Jeffrey leaving. The domestic violence officers advised her to get a restraining order against Backus, but told her that they could not guarantee her safety or that of her son. Mrs. Backus knew that her husband would not pay any attention to a restraining order, because he already

8

had ignored a number of them (apparently obtained on behalf of others).  She interpreted what she was told as meaning:  "I was on my own."  She and Jeffrey went back to the shelters in Chicago.

The second time Mrs. Backus returned to Miami was for a brief visit to see her oldest son graduate from high school.  This is the son who had moved out and had been living with friends after he had fought with Backus.  (When testifying about it later, Mrs. Backus proudly pointed out that in spite of everything Gabriel had worked hard and was an honors student.)

With the exception of those two trips, Mrs. Backus and Jeffrey were away from Miami for six months, beginning in April of 2001 and continuing until the search of the townhouse that October.  During that period she made no attempt to see Backus or to go back to their townhouse.  When asked why she did not attempt to return to the townhouse she owned along with her husband,  Mrs. Backus explained: "You have to realize something. [Backus] had a history which I was aware of, and I was not going to put myself or my son at risk.  Not any more. . . ."  During the time she was gone, Mrs. Backus could not make any mortgage or utility payments on the townhouse because she had left her job in Miami and did not have the money to make payments.

Backus was not willing to let things go. He wrote letters to Mrs. Backus and sent them to her through her family. Two of those letters are in the record. One is dated October 1, 2001, and the other is undated. The letters contain threats such as: "Death will come knocking;" "your [sic] going to get people killed;" "I am warning you I don't play child games. I want pay back and it is going to be Ugly;" "[n]o more appeals, no 2nd chance;" and "I welcome the electric chair, wham, bam and it's over!"

Around October 2001, Backus began harassing Mrs. Backus's sister in Coral Gables by going to her home and throwing objects onto her yard and porch, including bottles, fireworks, and what appeared to be a bomb but wasn't. He also called Mrs. Backus's mother and threatened to kill his wife's family and to gouge her mother's eyes out with a spoon. Mrs. Backus's sister contacted the Coral Gables Police Department, and that led to the Miami police bringing charges against Backus for his threats against Mrs. Backus's mother. In connection with that case, police officers in Miami contacted Mrs. Backus, who returned there to talk with them about Backus.

Mrs. Backus told the officers that her husband had a number of firearms in the townhouse, which interested them in part because it is illegal for him, as a convicted felon, to possess firearms. Mrs. Backus knew all about the firearms

10

because her husband, whose criminal record prevented him from buying them, had made her buy them for him. He had threatened to harm her if she didn't help him get the firearms, even saying that if she didn't he would spray her with bug spray and set it on fire.

Because of the potential federal firearms charges, the Miami police got the Bureau of Alcohol, Tobacco and Firearms involved in the case. Some of the officers verified through property records that Mrs. Backus owned the townhouse jointly with her husband, and they asked her to sign a consent form authorizing them to search the townhouse and a gun safe where she had told them the firearms were kept. In addition to giving the officers consent to search, Mrs. Backus gave them her house keys and the combination to the gun safe. This happened on October 18, 2001. Mrs. Backus cooperated fully with the officers in connection with the search because she was concerned that her husband might go on a rampage, and she wanted to get her belongings back: "I wanted to get at least the cat back which I had for ten years. My clothes. I left some of my jewelry behind. Everything."

Federal and state officers went to the townhouse to serve an arrest warrant on Backus for domestic abuse and to search for the firearms. He wasn't there. Mrs. Backus's keys opened the lower lock on the door but not the deadbolt above

it, which looked as though it had been recently replaced. Mrs. Backus, who was being kept at a safe place nearby, gave the officers permission to open the door by force, which they did. Once inside, the officers did not find any of Mrs. Backus's and Jeffrey's clothing or personal belongings. There were a number of malnourished cats in the townhouse, but not Mrs. Backus's favorite cat. The record does not disclose its fate or the fate of Jeffrey's puppy.

The record does disclose that the officers found a pump action shotgun under the sheets in Backus' bed. They also found three assault weapons and almost 4,000 rounds of ammunition in Backus' gun safe, which they opened with the combination Mrs. Backus had given them.

## III.

Thereafter, Backus was indicted for possessing a firearm and ammunition after having been convicted of a felony. He moved to suppress all evidence of the firearms and ammunition that had been found during the search of the townhouse. The ground for Backus' motion was that Mrs. Backus had abandoned the townhouse and thereby lost the authority to consent to a search of it. An evidentiary hearing was held on that motion. During that hearing, true to form, Backus disrupted Mrs. Backus's testimony by shouting insults at her and ordering

12

her to "shut up." The magistrate judge in turn ordered Backus to shut up and threatened to gag him if he didn't.

After hearing all of the evidence, the magistrate judge noted that the facts were essentially undisputed and recommended that the motion to suppress be denied. He did so after finding that: Mrs. Backus had left the house she jointly owned because she and her son feared Backus; during the six months she was hiding from him, Mrs. Backus continued to be a joint owner of the house with a joint right to control it; and, the only reason she had not asserted control over the property during that time was that Backus' violent, abusive behavior prevented her from doing so. The magistrate judge concluded that Mrs. Backus did exercise her lawful right to control over the property when she consented to a search of it by law enforcement. The district court adopted the magistrate judge's report and recommendation and entered an order denying the motion to suppress. Thereafter, Backus pleaded guilty to the charge against him, conditioned on his right to bring this appeal.

IV.

We said at the beginning of this opinion that the case presents an interesting Fourth Amendment issue, and it does. We didn't say that it was a difficult issue, and it is not. Backus' position is based upon his assertion that his wife abandoned

13

the townhouse when she left it on the morning of April 9, 2001, or in any event, abandoned it sometime between then and October 18, 2001, when she gave her consent to the search. To say that Mrs. Backus abandoned her home is like saying that Dolley Madison abandoned hers when she fled the White House the day before the British troops set it ablaze. There is a difference between voluntarily giving up your home and being forced to flee from it in fear for your life and the life of your child. The law should take account of that difference. Failure to do so would condone and reward violent, abusive behavior.

Mrs. Backus had as much ownership interest in the marital home as her husband did. Both their names were on the deed, and they had occupied the house jointly for five years. Only when the violence Backus was inflicting on her and her son became too much to take did she leave the home. But for his criminal acts against them, Mrs. Backus would have stayed there. It matters not that during the six months Mrs. Backus was hiding from her husband she failed to pay anything toward the mortgage or the utility bills. She had no money to do so, because she had to give up her job to get away from Backus. Nor is it significant that she did not return to their townhouse after he was arrested and before he was convicted, because she was afraid that he would get out and come there looking for her. Her

14

fears were not exaggerated. In sentencing Backus, the district court departed upward because of "the serious threats this defendant has made to his wife."

Backus focuses on his expectation of privacy, arguing that after six months he had no reason to expect that Mrs. Backus was going to return or assert any authority over the townhouse. See United States v. Shelton, 337 F.3d 529, 535-36 & n.24 (5th Cir. 2003). There is little to be said for that argument in this particular case and much to be said against it. To begin with, expectations of privacy must be reasonable to be honored by the law, see, e.g., United States v. Miravalles, 280 F.3d 1328, 1331 (11th Cir. 2002), and it is not reasonable to expect the law to honor an expectation of a wrongdoer that is grounded in events brought about by his wrongdoing. A lawless man cannot use violence to drive his wife away and then reasonably expect the law to give him the benefit of her absence.

On a more factual note, if Backus truly did not expect his wife to return, it is hard to understand why he would have felt it necessary to change the deadbolt lock on the door to prevent her key from working in it. Moreover, in the letters Backus sent to his wife through her family near the end of the six-month period, he was still insisting that she return, albeit in his usual less than diplomatic terms: "You had better get your ass over here and help;" "Don't fear knocking on my door, fear what's coming if you don't;" and "I am going to do something if you

don't get your ass over here & grow the fuck up." The point here is that it is not clear that Backus did not expect his wife to return and exert authority over their jointly owned townhouse, but it is clear that any expectation he may have had that she would never do so was an unreasonable one.

In the language of the Supreme Court's Matlock decision, given the circumstances it is "reasonable to recognize" that Mrs. Backus had "the right to permit the inspection in [her] own right" and that her husband "assumed the risk" that she might permit the townhouse to be searched. Matlock, 415 U.S. at 171 n.7, 94 S. Ct. at 993 n.7. Our conclusion finds support in the decisions from all of the other circuits that have addressed issues involving consent from an estranged wife to search the marital home from which she has fled, all of which uphold the resulting searches under various circumstances. See United States v. Gevedon, 214 F.3d 807, 808-11 (7th Cir. 2000); United States v. Brannan, 898 F.2d 107, 108 (9th Cir. 1990); United States v. Trzaska, 859 F.2d 1118, 1120 (2d Cir. 1988); United States v. Crouthers, 669 F.2d 635, 642-43 (10th Cir. 1982); United States v. Long, 524 F.2d 660, 661 (9th Cir. 1975); see also United States v. Shelton, 337 F.3d 529 (5th Cir. 2003) (involving an estranged wife who left because of her husband's infidelity).

The Long case involved facts particularly close to those before us. Mrs. Long, like Mrs. Backus, had fled the marital home because she feared for her safety, and in fleeing she had left behind a substantial number of her possessions. She, too, lived elsewhere before telling law enforcement agents about her husband's criminal activities. She, too, signed a consent form permitting a search and provided the agents with a key to the door. Her key, like Mrs. Backus' key, no longer worked so the agents had to gain access through other means. Id. at 660-61. Her husband, the defendant in Long, challenged his resulting conviction on the ground that his wife could not give valid consent for the search because she did not have joint access or control of the house within the meaning of the Matlock decision.

The Ninth Circuit rejected that contention, concluding that "[i]t cannot be convincingly argued that Mrs. Long as a joint owner of the house did not have the right to enter the house." Id. at 661. The central fact was that the two of them had shared the house "until Mrs. Long had been forced to leave due to her fear of her husband." Id. Exactly the same is true in this case. We reach the same conclusion as the Long Court, which is that for consent purposes the wife still retained joint access to, or control over, the house even though she had fled from it in fear of the husband.

17

Backus attempts to wiggle out of the tight fit of the <u>Long</u> case by pointing out that there the wife had been gone only a month, whereas here Mrs. Backus had been gone for six months. That wiggle won't work. Where a wife is driven by an abusive husband from the home she jointly owns and jointly occupied, the duration of her absence is likely to be influenced by the nature and extent of her fear. The greater the fear, the longer the absence. We are not willing to extend to violently abusive husbands something akin to a rule of repose against the authority of their wives to consent to a search of jointly owned property. To do so would reward unlawful behavior in direct proportion to the amount of terror it inflicts. One month or six, Mrs. Backus still had enough "common authority over or sufficient relationship to the premises," <u>Matlock</u>, 415 U.S. at 171, 94 S. Ct. at 993, to consent to a search of it.

AFFIRMED.